# Supreme Court of Texas

## No. 22-0124

Greg Abbott, in His Official Capacity as Governor of Texas, et al.,

*Petitioners*,

v.

Harris County, et al.,

*Respondents*

### On Petition for Review from the
### Court of Appeals for the Third District of Texas

**Argued February 22, 2023**

JUSTICE BLACKLOCK delivered the opinion of the Court.

JUSTICE LEHRMANN filed a concurring opinion.

Texas is nearly two hundred years old. Born, like our Nation, in a revolutionary war, our State has since endured the Civil War, the turmoil of Reconstruction, two World Wars, the Spanish flu, riots, droughts, floods, freezes, hurricanes, and now the coronavirus pandemic. These emergencies have come and gone. Others will come and go. Our Constitution endures. We owe a duty to those who came before us, and to those who will come after us, to uphold the "essential

principles of liberty and free government" established by our Constitution, which are the birthright of every new generation of Texans.[1]

The temptation to relinquish our enduring legacy of constitutional government is strongest in the face of life-threatening emergencies like the recent pandemic. In times like these, when calls for robust, expedient government action may sound more urgent than calls for proper constitutional process, adherence to our Constitution is more necessary than ever. "[W]e must not forget that few indeed have been the invasions upon essential liberties which have not been accompanied by pleas of urgent necessity advanced in good faith by responsible men." *Hirabayashi v. United States*, 320 U.S. 81, 113 (1943) (Murphy, J., concurring).

We are asked about the scope of the power granted to the Governor by the Texas Disaster Act. As the State acknowledges, that power is not unlimited, even in a pandemic. Nor could it be. The Texas Constitution, a far higher source of authority than the Disaster Act or an executive order, gives both the power to make laws and the power to suspend laws to the Legislature. TEX. CONST. art. III, § 1; art. I, § 28. Our Constitution's strong separation-of-powers provision, like everything else in our Constitution, "is not suspended when the government declares a state of disaster." *In re Abbott*, 601 S.W.3d 802, 805 (Tex. 2020). It says that "no person" in another department of

---

[1] TEX. CONST. art. I ("That the general, great and essential principles of liberty and free government may be recognized and established, we declare . . . .").

government "shall exercise any power properly attached to" the legislative department. TEX. CONST. art. II, § 1. If the Disaster Act handed over to the Governor unlimited law-making authority or unlimited law-suspending authority during a disaster—no matter how all-consuming the disaster seemed to be—there can be little doubt the Act would be unconstitutional.

As explained below, we need not read the Disaster Act so expansively in order to conclude that it grants the Governor the authority to prohibit local governments from requiring the wearing of masks in response to a contagious disease.[2] The judgment of the court of appeals is reversed, the temporary injunction is dissolved, and the case is remanded to the district court for further proceedings consistent with this opinion.

## I.

On January 20, 2020, the United States reported its first confirmed case of a new coronavirus that soon came to be known as

---

[2] Whether the Governor has the disputed authority under current law remains a live controversy as of the issuance of our judgment today. The 88th Legislature recently passed—and the Governor signed—a statutory prohibition on governmental mask-wearing requirements, but the new statute does not take effect until September 1, 2023. Act of May 28, 2023, 88th Leg., R.S., ch. 336, § 2, 2023 Tex. Sess. Law Serv. ch. 336 (to be codified at TEX. HEALTH & SAFETY CODE §§ 81B.001, *et seq.*). Although the new statute will provide the governing rule when it becomes effective in the future, there remains a justiciable dispute today regarding the Governor's authority under current law to prohibit local mask requirements and the validity of the district court's injunction attempting to prohibit him from so doing. *See infra* n.19 & n.23.

"Covid-19."[3]  Less than two months later, citing authority granted by the Disaster Act, the Governor issued his first coronavirus-related executive order.[4]  This statewide emergency measure was intended to supersede an assortment of local-government orders already in circulation.[5]  It contained extraordinary temporary measures that aimed to "slow the spread" of the virus.[6]  Later executive orders soon loosened some of these restrictions.[7]  Beginning in July 2020, the gubernatorial orders required Texans to wear masks in many public settings.[8]

Over three years have passed since the Governor issued his first emergency order, and daily life in Texas has returned to normal.  Even so, virus-related executive orders issued by the Governor remained in place as late as June 2023.  As of March 2021, however, the Governor's

---

[3] United States Centers for Disease Control and Prevention, *CDC Museum COVID-19 Timeline* (last reviewed Mar. 15, 2023), https://www.cdc.gov/museum/timeline/covid19.html.

[4] The Governor of the State of Texas, Exec. Order GA-08 (issued Mar. 19, 2020), 45 Tex. Reg. 2271, 2271 (2020).

[5] The order stated: "This executive order supersedes all previous orders on this matter that are in conflict or inconsistent with its terms . . . ." *Id.*  The only orders in place at the time were local orders in various jurisdictions.

[6] *Id.*

[7] *See, e.g.*, The Governor of the State of Texas, Exec. Order GA-18 (issued Apr. 27, 2020), 45 Tex. Reg. 2933, 2934 (2020) (reopening certain retail establishments and restaurants for dine-in services with capacity restrictions); The Governor of the State of Texas, Exec. Order GA-26 (issued June 3, 2020), 45 Tex. Reg. 3943, 3943–44 (2020) (loosening capacity restrictions).

[8] The Governor of the State of Texas, Exec. Order GA-29 (issued July 2, 2020), 45 Tex. Reg. 4849, 4849 (2020).

4

executive orders ceased to require masks or to impose any other significant statewide restrictions.[9]  Since that time, the Governor's orders sought primarily to preserve the liberties his earlier orders curtailed by prohibiting local governments from imposing any virus-related restrictions of their own.[10]  One of the Governor's executive orders, known as GA-38, prohibited local mask requirements.  GA-38 remained in effect until June 2023, and it is the subject of the three cases now before this Court.  It stated: "No governmental entity, including a county, city, school district, and public health authority, and no governmental official may require any person to wear a face covering or to mandate that another person wear a face covering."[11]

Acting apart from the Governor, many local government officials issued their own orders in response to the virus.  They too relied on the Disaster Act for authority, as well as on various provisions of the Health and Safety Code.  Despite GA-38, some local jurisdictions continued to maintain orders or policies requiring mask-wearing, although to our knowledge none of these local requirements has been actively enforced for some time.

---

[9] The Governor of the State of Texas, Exec. Order GA-34 (issued Mar. 2, 2021), 46 Tex. Reg. 1567, 1568 (2021).

[10] *See, e.g.*, *id.* (prohibiting locally imposed restrictions, with exceptions); The Governor of the State of Texas, Exec. Order GA-38 (issued July 29, 2021), 46 Tex. Reg. 4913, 4914–15 (2021) (prohibiting all locally imposed restrictions).

[11] The Governor of the State of Texas, Exec. Order GA-38 (issued July 29, 2021), 46 Tex. Reg. 4913, 4915 (2021).  Like Senate Bill 29, GA-38 contained exceptions for state-supported living centers, hospitals owned or operated by the government, and prisons and jails.

Claiming independent authority to require masks in their jurisdictions in contravention of the Governor's orders, several local governments sued the Governor—and in some cases the Attorney General as well—to prevent enforcement of GA-38 and to block future gubernatorial orders prohibiting local mask mandates. Cases brought by Harris County, Dallas County, and the City of San Antonio are now before this Court. This opinion addresses the Harris County litigation, and we address the other two argued cases in brief opinions also issued today.

We conclude that gubernatorial Disaster Act orders countermanding local mask mandates lawfully preempt local government orders to the contrary. We reach that decision not because the Disaster Act gives the Governor carte blanche to issue any virus-related order of his choosing. But neither can we endorse the local governments' expansive view of their autonomy during a statewide pandemic. All involved exercise limited authority, defined by statute and constrained by the Constitution.

The question, in the end, is who has the final say when the state government disagrees with a local government about how best to strike the balance between respecting the liberties of the People and attempting to reduce the spread of a contagious disease. The answer is certainly not the judges. When properly called upon to say whether the balance struck by other officials comports with the law and the Constitution, judges must answer. But we are not empowered to strike the balance ourselves. "The People elect legislative and executive branch officials—not judges or 'experts'—to make judgments about the

6

costs and benefits of government action and to balance competing policy goals in light of those judgments." *Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 926 (Tex. 2020) (Blacklock, J., concurring).

As we read the relevant statutes, the orders of local officials about contagious-disease response must yield to conflicting orders at the state level, including the Governor's orders during a declared disaster. Local government authority is derived from the State's authority. Rarely in Texas law would a direct conflict between state authority and local authority be resolved in favor of local authority, and the statutes at issue do not dictate such an upside-down result here. As explained in more detail below, both the Disaster Act and the Health and Safety Code demonstrate that the Legislature has reserved the ultimate authority to make policy judgments about how best to respond to a regional or statewide health emergency to the state government rather than authorizing a variety of local responses that conflict with statewide policy.

As a practical matter, this result should hardly be surprising. A coherent governmental response to a widespread contagious disease naturally requires coordination across arbitrary local jurisdictional lines, of which viruses are oblivious. The Legislature has therefore, quite unremarkably, given state officials the authority to control governmental contagious-disease response on a regional or statewide basis. The Disaster Act empowers the Governor to exercise similar control over local governments during a declared disaster. We hold that, during a declared disaster, the Governor has the lawful authority to

7

prohibit local officials from imposing mask requirements in response to a contagious disease.

## II.

On March 11, 2020, Harris County Judge Lina Hidalgo declared a state of local disaster. *See* TEX. GOV'T CODE § 418.108(a). Her first mask order, issued on April 22, 2020, required "all persons over the age of ten" to "wear some form of face covering that covers the nose and mouth" "[w]hen leaving one's residence and when in a public place."[12] Later orders loosened this rule, requiring masks in fewer circumstances. While this appeal was pending, these restrictions loosened further.

Three local mask requirements issued by various authorities in Harris County have been the primary subject of this litigation. First, Judge Hidalgo's August 17, 2021 order, which relies for its authority on the Disaster Act, requires masks in county-owned buildings.[13] Second, a May 2021 order of the Harris County Commissioners Court requires county employees to wear masks in county buildings.[14] Harris County relies primarily on section 121.003(a) of the Health and Safety Code as the basis for the Commissioners Court's actions. That provision grants the "governing body of a municipality or the commissioners court of a

---

[12] Harris County Judge Lina Hidalgo, Order on Use of Face Coverings (issued Apr. 22, 2020).

[13] Harris County Judge Lina Hidalgo, Eighth Order Authorizing Fever and Health Screening and Face Coverings in County Buildings (issued Aug. 17, 2021).

[14] Harris County Commissioners Court, Order Requiring Fever and Health Screening and Face Coverings in County Owned or Controlled Buildings (issued May 25, 2021).

8

county" authority to "enforce any law that is reasonably necessary to protect the public health." Third, an order issued by former Harris County Health Authority Janeana White requires schools to follow the CDC's mask recommendations.[15] That order relies on sections 81.082 and 121.024 of the Health and Safety Code.

Harris County[16] sued both the Governor and the Attorney General,[17] seeking an injunction against enforcement of GA-38 as well as an injunction against future, similar executive orders. The district court granted a temporary restraining order. The State filed a plea to the jurisdiction, which the district court denied. At the same time, the district court granted a temporary injunction prohibiting both the Governor and the Attorney General from enforcing GA-38 in Harris County. The injunction also enjoined both defendants with respect to "any subsequent executive order" suspending any of the laws relied upon by the County as authority for its local mask requirements. The State appealed, which stayed the injunction and all other proceedings in the district court. TEX. R. APP. P. 29.1(b); TEX. CIV. PRAC. & REM. CODE § 51.014(a)(4), (a)(8), (b). The court of appeals affirmed the temporary injunction and the denial of the plea to the jurisdiction. 641 S.W.3d 514, 530 (Tex. App.—Austin 2022). The temporary injunction has remained

---

[15] Harris County Health Authority, Order of the Local Health Authority for Harris County Regarding Public Schools (issued Aug. 12, 2021).

[16] The plaintiffs also include Harris County Commissioner Rodney Ellis and former Harris County Health Authority Janeana White. We refer to the plaintiffs collectively as Harris County when the distinction is immaterial.

[17] We refer to the defendants collectively as the State when the distinction is immaterial.

stayed throughout the proceedings in this Court. TEX. R. APP. P. 29.1(b).[18]

The State petitioned for review. We granted the petition and consolidated the case for argument with similar cases involving Dallas County and the City of San Antonio.[19] As described below, we resolve the Harris County appeal by dissolving the temporary injunction and reversing the judgment of the court of appeals.[20]

---

[18] In the related litigation from San Antonio, the court of appeals issued a Rule 29.3 order reinstating the temporary injunction at the County's request. *Abbott v. City of San Antonio*, No. 04-21-00342-CV (Tex. App.—San Antonio Aug. 19, 2021) (order). We reversed that action. *In re Abbott*, No. 21-0720 (Tex. Aug. 26, 2021) (order). None of the injunctions against GA-38 has been in effect during the pendency of the appeals now before this Court.

[19] After oral argument, on June 2, 2023, the Governor signed into law Senate Bill 29, under which "a governmental entity may not implement, order, or otherwise impose a mandate requiring a person to wear a face mask or other face covering to prevent the spread of COVID-19." Act of May 28, 2023, 88th Leg., R.S., ch. 336, § 1, sec. 81B.002(a), 2023 Tex. Sess. Law Serv. ch. 336 (to be codified at TEX. HEALTH & SAFETY CODE § 81B.002(a)). The bill does not take effect until September 1, 2023. *Id.* § 2. It therefore does not resolve—at least for the intervening two-month period—the parties' ongoing dispute about the Governor's authority to supersede local mask requirements under current law or the parties' dispute about the validity of the temporary injunction. This case therefore remains a live and justiciable one. Our resolution of it now is consistent with our settled practice of disposing of all pending causes each year by the end of June.

[20] In the court of appeals, the State challenged both the temporary injunction and the denial of the plea to the jurisdiction. TEX. CIV. PRAC. & REM. CODE § 51.014(a)(4), (a)(8). The court of appeals affirmed on both counts. 641 S.W.3d at 530. In so doing, the court correctly noted that the probable-right-to-relief inquiry in the temporary-injunction appeal overlaps with the plea-to-the-jurisdiction inquiry into whether the County has stated a valid *ultra vires* claim; both inquiries may require preliminary consideration of the parties' competing interpretations of the law. *Id.* at 521. In this Court, the State's briefing requests only reversal of the temporary injunction and does

## III.

In general, appellate review of an order granting injunctive relief is for abuse of discretion. *Anti-Defamation League*, 610 S.W.3d at 916. However, the trial court "has no 'discretion' to incorrectly analyze or apply the law." *Id.* Because the propriety of the injunction in this case turns on a proper understanding of the Disaster Act and other statutes, which are pure questions of law, review is de novo.

To obtain a temporary injunction, an applicant must "plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). If any one of these required showings is lacking, the injunction should be denied (or reversed on appeal). The parties focus most of their attention on whether Harris County has established a probable right to relief on its claim that the Governor lacks authority to prohibit local officials from requiring masks. We will do the same.[21]

## A.

As a threshold matter, the State contends that Harris County lacks standing to sue the Governor. Earlier in the litigation, the State

not ask for reversal of the denial of the plea to the jurisdiction. We address only the validity of the temporary injunction, although as a practical matter our answer to that question may also dictate whether the plea to the jurisdiction should have been granted.

[21] Although this opinion resolves only the Harris County appeal, our consideration of the legal questions discussed herein is informed by the briefing submitted in all three of the related cases consolidated for argument, as well as by amicus briefs.

made similar arguments as to the Attorney General, but in this Court the State does not contest Harris County's standing to sue the Attorney General.

A plaintiff who lacks standing will always lack a probable right to relief, so if standing is lacking, there can be no entitlement to a temporary injunction.[22] If Harris County lacks standing to sue both the Governor and the Attorney General, then the County would lack standing to maintain this litigation altogether, and the appeal could be disposed of on that ground alone. In such a case, we would have no need to consider the merits of Harris County's claims. If the Attorney General is a proper defendant, however, then resolving the parties' vigorous dispute about whether the Governor is *also* a proper defendant would not alleviate the need to consider the merits. We would still need to consider the injunction's validity as to the Attorney General, which would require us to determine whether Harris County has a probable right to relief on the merits.

We therefore consider first whether Harris County has standing to sue the Attorney General. Although the State does not contest the point, standing is a jurisdictional prerequisite that cannot be conferred by concession. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444–45 (Tex. 1993). Standing requires an injury-in-fact that is fairly traceable to the defendant's conduct and likely to be redressed by a

_____

[22] *See Anti-Defamation League*, 610 S.W.3d at 917 ("At this preliminary stage, the plaintiffs must demonstrate both standing to bring their claims and that the claims will probably succeed on the merits in order to establish a probable right to relief. The failure of either showing means a probable right to relief is lacking and a temporary injunction is unavailable.").

decision in the plaintiff's favor. *Heckman v. Williamson County*, 369 S.W.3d 137, 154–55 (Tex. 2012). A plaintiff seeking an injunction against a defendant's enforcement of a governmental enactment may establish injury-in-fact by demonstrating "a credible threat of prosecution thereunder." *In re Abbott*, 601 S.W.3d at 812 (quoting *Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

The State does not deny that the Attorney General's threat of civil actions against the plaintiffs for violating the Governor's orders amounts to a "credible threat" that creates the injury required for standing. Nor does the State deny that the threat of enforcement would be alleviated by an injunction against the Attorney General. The information before us confirms the validity of the State's concession. The Attorney General sent a letter to County Judge Hidalgo and the Harris County Commissioners Court threatening "legal action, including any available injunctive relief, . . . penalties, sanctions— including contempt of court—available at law" in response to their violations of the Governor's prohibition on mask requirements. The Attorney General's website confirms the initiation of at least nine such enforcement actions against local governments. *See, e.g.*, *In re Round Rock Indep. Sch. Dist.*, No. 03-21-00472-CV, 2021 WL 4350299, at *1 (Tex. App.—Austin Sept. 24, 2021, orig. proceeding). The State makes no argument that this course of action by the Attorney General is insufficient to confer standing on Harris County to sue the Attorney General seeking protection from the credible threat that he will bring enforcement actions against the County if it seeks to enforce local mask

13

requirements.[23] We conclude that Harris County has standing to pursue its claims against the Attorney General. We therefore proceed to consider whether Harris County has a probable right to relief on the merits of those claims.[24]

**B.**

The State contends that Harris County has no probable right to relief because the Disaster Act grants the Governor broad authority to control disaster response throughout the state. The State advances three theories for why this is so: (1) certain local officers, including county judges, are the Governor's "designated agents" under the Disaster Act and therefore subject to his control; (2) the Governor validly suspended the statutes on which the local officials rely for their

---

[23] The Governor allowed GA-38 to expire in June 2023 in anticipation of Senate Bill 29's effectiveness. The expiration of GA-38 does not render this appeal moot, however. The challenged temporary injunction reaches beyond GA-38 by purporting to restrict the authority of the Governor and the Attorney General with regard to "any subsequent executive order." The County's live petition likewise seeks relief as to future executive orders beyond GA-38. The parties' dispute about the temporary injunction's validity therefore remains live despite the expiration of GA-38, which means the parties' ongoing dispute about the authority of the Governor and Attorney General to block local mask mandates under current law remains a justiciable controversy, at least until the effective date of Senate Bill 29.

[24] Resolving the additional, hotly contested question of whether the Governor is a proper defendant would bring us no closer to determining the temporary injunction's validity. Harris County's standing to sue the Attorney General means that we must assess whether the County has a probable right to relief on the merits, and our negative answer to that question means the injunction cannot stand as to any defendant. In this circumstance, further consideration of the County's standing to sue the Governor would be superfluous.

14

authority; and (3) an executive order prohibiting mask mandates preempts contrary local orders. We consider these theories in turn.[25]

We begin with the relationship between the Governor and the Harris County Judge, both of whom derive their claimed authority from the Disaster Act. Doing so resolves the parties' dispute as to Judge Hidalgo's August 17, 2021 order and as to any other local action that relies on Judge Hidalgo's authority.[26] Under the Disaster Act, "[t]he

---

[25] As two alternative theories of the Governor's Disaster Act authority, the State relies on the Governor's authority to suspend statutes and on the preemptive effect of his executive orders. The briefing tends to conflate the two concepts, to varying degrees. For instance, the local governments suggest that if an executive order prevails over local orders to the contrary, then the statutes authorizing the local orders have been "suspended," which can only be valid if the law and the Constitution authorize such a "suspension of statutes." As we see it, the better approach is to address preemption and suspension as distinct bases for the Governor's authority. The preemption analysis involves determining, as between conflicting state and local orders, which one prevails. Absent the conflict, both might be enforceable, but because of the conflict, only one can prevail. Courts often resolve similar conflicts between competing legal rules. When one rule prevails and one does not, we do not say that the statute authorizing the losing rule has been "suspended." On the other hand, the Governor's suspension of a statute—as the State theorizes it and as we understand it for purposes of this opinion—involves temporarily eliminating the statutory authority on which the local orders were premised. If statutes have been suspended in this sense, as the State contends they have, then a preemptive gubernatorial order imposing a contrary rule would be unnecessary because there would be no statutory basis for the local governments' actions.

[26] Harris County asserts that the County Judge's orders are not at issue in this appeal, and it seeks to focus our attention solely on the orders issued by the Harris County Commissioners Court and the Harris County Health Authority. On numerous occasions, however, including when it filed its original petition, Harris County attached orders issued by Judge Hidalgo—not just the Commissioners Court or the Health Authority—in support of its applications for temporary relief. The district court's temporary injunction prohibited the defendants from suspending the provisions of the Disaster Act

15

presiding officer of the governing body" of a local government "is designated as the emergency management director" for that local government. TEX. GOV'T CODE § 418.1015(a). Thus, for a county, the county judge is the emergency management director under the Disaster Act. For a city, the mayor has that role.

The key to understanding the relationship between the Governor and these local officials under the Disaster Act is section 418.1015(b), which reads:

> An emergency management director serves as the governor's designated agent in the administration and supervision of duties under this chapter. An emergency management director may exercise the powers granted to the governor under this chapter on an appropriate local scale.

As might be predicted, the State emphasizes the first sentence, while the County emphasizes the second. The first sentence indicates that local officials are subservient to the Governor as his "designated agents" with respect to "duties under this chapter." The second sentence, however, vests those very same local officials with a great deal of authority. "[T]he powers granted to the governor under this chapter" are substantial, even when exercised only "on an appropriate local scale."

Because these two key sentences appear together in a single subsection of the Disaster Act, we should interpret them to operate in

---

on which Judge Hidalgo's orders rely. The court of appeals likewise considered the validity of Judge Hidalgo's orders to be at issue. 641 S.W.3d at 526–28. We agree. We consider the separate orders of the Commissioners Court and the Health Authority below.

tandem rather than as separate, stand-alone rules. Subsection (b) begins by establishing the relationship between the Governor and his "designated agents." It then authorizes the officials it has just made agents of the Governor to exercise power equivalent to the Governor's on a local level. In light of the first sentence, these officials exercise the apparently broad local power authorized by the second sentence not independently of the Governor but as his "designated agents." The two sentences thus work together to broadly empower local officials on a local scale, but only within their role as the Governor's "designated agents."

The ineluctable consequence of their "designated agent" status is that county judges and mayors—despite their considerable Disaster Act authority at the local level—are subject to the Governor's oversight and control with respect to their "duties under this chapter," which includes the exercise of their local Disaster Act authority. When local officials and the Governor attempt to impose different rules using their Disaster Act powers, one or the other must prevail. Both cannot coexist. The Disaster Act's express relegation of county judges to the status of the Governor's "designated agents" makes it clear which of conflicting orders must prevail under this statutory scheme.

Harris County contends that the Governor's control over his designated agents does not extend so far as to authorize him to eliminate disaster-response measures imposed at the local level. In the County's view, "[t]he chief purpose of the Disaster Act is clear: giving governmental entities and officials the tools they need to protect people

17

and save lives during a disaster."[27]  It follows, the County contends, that gubernatorial actions *eliminating* local disease control measures are invalid because they do not aim to reduce the effects of the disease.  This line of argument—that the Governor can only use the Disaster Act to alleviate the threat of the virus and therefore cannot use the Act to alleviate the burden of a local government's virus-related restrictions— undergirds much of the County's briefing as well as that of the other local governments and their supporting amici.

We have rejected this constrained view of the Disaster Act before, and we do so again today.  In *Abbott v. Anti-Defamation League*, we rejected the argument that "each order issued by the Governor during a disaster must be motivated by a desire to alleviate the threat of the pandemic."  610 S.W.3d at 918.  We held that "[n]othing in the Disaster Act supports this view of the Governor's authority."  *Id.*  To the contrary, "the Governor must necessarily balance a variety of competing considerations" when exercising the authority the Act grants him, including "encouraging economic recovery" and "preserving constitutional rights."  *Id.*

We reiterate this holding today.  The government's response to a contagious disease affecting the entire state must balance a variety of considerations, just one of which is the desire to reduce the virus's spread.  The Disaster Act's textually stated purposes include both "reduc[ing] vulnerability of people" to a disaster and providing for "rapid

---

[27] Resp. Br. on the Merits, at 16; *see also id.* at 24 n.5 ("[T]he Governor would be unable to invoke that limited agency relationship when he seeks to act contrary to his statutory duties and prohibit a County Judge or Mayor from meeting the dangers to the state and people presented by disasters.").

and orderly restoration and rehabilitation of persons and property affected" by a disaster. TEX. GOV'T CODE § 418.002(1), (3). The potential for tension between these two responsibilities is obvious. The Act tasks the Governor, ultimately, with striking a balance between reduced vulnerability and rapid recovery.

Restrictions on daily life designed to combat a contagious disease come with corresponding costs to the liberty and dignity of free citizens. Some of these costs can be measured in economic terms, but there are other costs that may not be readily quantifiable—such as interference with children's education and development, the psychological toll of isolation, and disintegration of the social connections that bind communities together. There is also an inherent cost when imposing restrictions on the daily lives of a free people who are long accustomed to liberty under a government obligated not to abridge "the right of the people peaceably to assemble." U.S. CONST. amend. I.[28] Nothing in the Disaster Act prohibits an official tasked with balancing the costs and benefits of proposed government responses to a pandemic from taking into account all the potential costs—in addition to the potential benefits—when deciding whether and for how long to impose the kind of extraordinary measures we saw in recent years.

It is not the judiciary's job to weigh the costs and benefits ourselves. When responding to disasters, "[a] balance must be struck," and the question for the courts is "which branch of Texas government gets to strike" it, so long as the law and the Constitution are followed.

---

[28] *See also* TEX. CONST. art. I, § 27 ("The citizens shall have the right, in a peaceable manner, to assemble together for their common good . . . .").

19

*Anti-Defamation League*, 610 S.W.3d at 926 (Blacklock, J., concurring).[29] Deciding how best to balance the costs and benefits of any particular government response to a pandemic is a difficult, policy-laden decision for which the Governor, not the courts or local officials, has ultimate responsibility under the Disaster Act. This does not mean that the Governor's authority under the Disaster Act is without limits. But in the limited context of competing Disaster Act orders issued by the Governor and by local officials, the Disaster Act grants ultimate authority to the Governor, who may countermand the orders of his "designated agents" when they conflict with his preferred methods of responding to the disaster.

We conclude that the Disaster Act empowers the Governor to override the decisions of the county judges and other local officials who serve as his "designated agents" as described by section 418.1015(b). As a result, gubernatorial executive orders lawfully supersede contrary orders issued by Harris County Judge Hidalgo or premised on her authority. To the extent the temporary injunction would empower the Governor's designated agent, Judge Hidalgo, to act contrary to the Governor's orders with respect to mask requirements, it was improper.

## C.

The orders of the Harris County Commissioners Court and Health Authority, who are not the Governor's "designated agents" under the Disaster Act, remain to be addressed. We therefore consider the

---

[29] *See also Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 142 S. Ct. 661, 670 (2022) (Gorsuch, J., concurring) ("The question before us is not how to respond to the pandemic, but who holds the power to do so.").

State's argument that section 418.016(a) of the Disaster Act empowers the Governor to suspend any statutes on which Harris County might rely to impose mask requirements. If that is correct, then the case could easily be resolved on that basis alone.

The Disaster Act provides: "The Governor may suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business or the orders or rules of a state agency if strict compliance with the provisions, orders, or rules would in any way prevent, hinder, or delay necessary action in coping with a disaster." TEX. GOV'T CODE § 418.016(a). This language places textual limitations on the power it grants to suspend statutes. For instance, the statutes suspended must be "regulatory." They must also "prescrib[e] the procedures for conduct of state business." The parties disagree about the contours of these requirements.

As an initial matter, the County argues that the Disaster Act does not empower the Governor to suspend statutes that authorize local officials to respond to disasters. In the County's view, because section 418.016 only allows suspension of a statute when "strict compliance" with the statute "would in any way prevent, hinder, or delay necessary action in coping with a disaster," the Governor only has authority to suspend statutes that are *hindering* virus-containment measures and cannot suspend statutes that are *imposing* virus-containment measures.[30]

---

[30] The court of appeals in one of the other pending cases relied on similar reasoning. *Abbott v. Jenkins*, 665 S.W.3d 675, 692 (Tex. App.—Dallas 2021) ("If we assume for purposes of this argument that GA-38 balances the variety

21

We again reject any such argument. *See supra* at 17–20. If, in the Governor's judgment, "necessary action in coping with a disaster" includes alleviating disaster-related restrictions on liberty imposed by local governments in order to facilitate recovery from the disaster and restoration of normal life, nothing in the Disaster Act prohibits him from acting on that judgment. *Anti-Defamation League*, 610 S.W.3d at 918. The courts should have no role to play in deciding what is or is not "necessary action in coping with a disaster."[31] Our job is to determine whether the Governor acts pursuant to his statutory authority when he suspends the statutes on which the local governments rely. Here, the answer to that question depends on whether the suspended statutes were "regulatory statute[s] prescribing the procedures for conduct of state business." TEX. GOV'T CODE § 418.016(a).

The State offers a broad interpretation of this power. In its view, the term "regulatory statute" describes any statutes that "control or direct according to rule." Because the suspended statutes either direct the state's disaster response according to rule or provide local government officials with the power to "control or supervise by means of rules," the suspended provisions are "regulatory statutes" within the meaning of the Act, as the State sees it. The State adopts a similarly

---

of considerations that appellants outline, we still must consider whether a county judge's face-covering mandate prevents, hinders, or delays necessary action in coping with a disaster.") (cleaned up).

[31] If it were alleged that the action taken was not genuinely related to the disaster but instead relied on the disaster as a pretense to accomplish unrelated ends, it is conceivable that the courts could play a role in resolving such a dispute. That is not the allegation here.

broad view of the phrase "procedures for conduct of state business." Because coordinating disaster response is the "conduct of state business," any statute that interferes with the Governor's coordination of disaster response is a statute "prescribing the procedures for conduct of state business"—and therefore subject to suspension by the Governor—in the State's view.

Harris County offers a competing interpretation of section 418.016(a), under which the only statutes eligible for suspension are those that prescribe the methods (the "procedures") by which the business of *state* government—as opposed to local government—must be conducted. Under this view, the Governor could use section 418.016(a) to "cut red tape," streamlining the regulations and procedures by which the state government operates when the normal procedures are too cumbersome in a time-sensitive disaster. He could not simply suspend any statute that interferes with his preferred response to the disaster, including statutes about local government authority.

Rather than proceeding directly into this statutory interpretation dispute, we first note that even if we were to adopt the State's broad construction of section 418.016(a), we would still have to contend with the County's argument that the State's broad view of the Governor's suspension power runs afoul of the Suspension Clause of the Texas Constitution. TEX. CONST. art. I, § 28. This argument raises a serious question of constitutional law, which we should not resolve unless required to do so. *In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003) ("[W]e only decide constitutional questions when we cannot resolve issues on nonconstitutional grounds.").

23

Demonstrating the gravity of the constitutional question raised by the County—and the concomitant need to avoid deciding it if possible—requires only a brief explanation. The Suspension Clause's predecessor, adopted in 1845, provided: "No power of suspending laws in this State shall be exercised, except by the legislature or its authority."[32] At the Convention of 1876, the Clause was changed to omit the words "or its authority."[33] The result is the provision that exists today: "No power of suspending laws in this State shall be exercised except by the Legislature." TEX. CONST. art. I, § 28.

In 1898, the Court of Criminal Appeals held that when the words "or its authority" were removed, "the authority of the legislature to delegate its power to suspend laws was repealed, and that body was inhibited from delegating authority to suspend laws in whole or in part." *Coombs v. State*, 44 S.W. 854, 860 (Tex. Crim. App. 1898). Not long after, this Court observed:

> This section restricts the power to suspend laws to the Legislature, and expressly prohibits the exercise of such power by any other body. In view of this provision of the Constitution, it must be held (whatever may have been the power of the Legislature under former Constitutions) that that body cannot now delegate to a municipal corporation or to any one else authority to suspend a statute law of the state.

---

[32] TEX. CONST. of 1845, art. 1, § 20; *see also* WILLIAM F. WEEKS, DEBATES OF THE TEXAS CONVENTION 20, 22 (1846), https://tarlton.law.utexas.edu/c.php?g=787754&p=5640115 (detailing the history of the Suspension Clause at the Constitutional Convention of 1845).

[33] JOURNAL OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF TEXAS 274 (1875), https://tarlton.law.utexas.edu/c.php?g=813324&p=5803246.

*Brown Cracker & Candy Co. v. City of Dallas*, 137 S.W. 342, 343 (Tex. 1911) (internal quotations omitted).[34]

The State argues that more recent decisions—such as *Sproles v. Binford*, 52 F.2d 730, 737 (S.D. Tex. 1931), *aff'd*, 286 U.S. 374, 397 (1932), and *Williams v. State*, 176 S.W.2d 177, 183 (Tex. Crim. App. 1943)—counsel in favor of the Legislature's authority to empower executive officials to suspend statutes. The County disagrees, and we do not resolve the dispute.[35] We merely observe that it is not possible to

[34] Similar judicial statements abound in the decades following the 1876 Convention. *See, e.g.*, *Ex parte Muncy*, 163 S.W. 29, 49 (Tex. Crim. App. 1914) (Davidson, J., dissenting) ("This former addendum 'or its authority' was cut out of the Constitution by amendment of 1874, thereby excluding the idea that the Legislature could delegate this authority either to the courts or any other officer or tribunal. Not only does it exclude such idea, but it is a positive inhibition. The very object and intent of that amendment was to prevent a delegation of the power, which delegation had worked woeful results, especially in the 'reconstruction' days.") (emphasis omitted); *Ex parte Farnsworth*, 135 S.W. 535, 537 (Tex. Crim. App. 1911) ("The Legislature only may suspend laws by virtue of article 1, § 28, of the Constitution, but it cannot suspend the Constitution, nor can it authorize any other department of the government— municipal or state—to suspend any law."); *Mo., K. & T. Ry. Co. of Tex. v. Shannon*, 100 S.W. 138, 146 (Tex. 1907) ("The purpose of section 28, art. 1, of our state Constitution . . . was to prohibit the Legislature from delegating to its officers the power of suspending the laws . . . .").

[35] It is also possible that, because of Suspension Clause concerns, section 418.016(a) might be interpreted not as granting the power to suspend statutes altogether but instead as an indication that the Governor's authorized executive orders—which the Disaster Act says have "the force and effect of law"—should prevail over contrary applications of a "regulatory statute prescribing the procedures for conduct of state business." Whether such a limiting construction of section 418.016(a) is supportable—and whether it would satisfy the Suspension Clause—we need not decide today. *See Trs. of Indep. Sch. Dist. of Cleburne v. Johnson Cnty. Democratic Exec. Comm.*, 52 S.W.2d 71, 72 (Tex. 1932) (quoting *United States ex rel. Att'y Gen. v. Del. & Hudson Co.*, 213 U.S. 366, 408 (1909)) ("[W]here a statute is susceptible of two

25

rest our decision on the State's invocation of section 418.016(a)'s suspension-of-statutes authority without wading into deep constitutional waters. Because we can avoid reaching these questions by declining to resolve the parties' disputes about the meaning and constitutionality of section 418.016(a) and instead resting our decision on other grounds, we must do so. *In re B.L.D.*, 113 S.W.3d at 349. We leave to another day a definitive construction of the Suspension Clause.

## D.

Turning next to the State's preemption theory, the State asserts that the Governor's executive orders issued under the Disaster Act preempt any local action to the contrary. We agree that if a gubernatorial executive order is a valid use of the Disaster Act that truly carries "the force and effect of law," TEX. GOV'T CODE § 418.012, then it preempts contrary actions by local governments because state law generally prevails over local enactments.[36] The question, therefore, is whether GA-38 is a valid exercise of the Governor's authority under the Disaster Act to issue executive orders that carry "the force and effect of law."

---

constructions, by one of which grave and doubtful constitutional questions arise, and by the other of which such questions are avoided, our duty is to adopt the latter.").

[36] *See City of Richardson v. Oncor Elec. Delivery Co.*, 539 S.W.3d 252, 263 (Tex. 2018) (holding that state executive-branch orders carrying the "force and effect of law" control over local enactments to the contrary); *see also City of Laredo v. Laredo Merchants Ass'n*, 550 S.W.3d 586, 588 (Tex. 2018) (citing TEX. CONST. art. XI, § 5(a)) ("[C]ity ordinances cannot conflict with state law."); *see also Childress County v. State*, 92 S.W.2d 1011, 1015 (Tex. 1936) ("The county is merely an arm of the state. It is a political subdivision thereof.").

## 1.

The Disaster Act provides: "Under this chapter, the governor may issue executive orders, proclamations, and regulations and amend or rescind them. Executive orders, proclamations, and regulations have the force and effect of law." TEX. GOV'T CODE § 418.012. We understand the State to argue that this provision gives the Governor broad authority to issue executive orders having the force and effect of law on any topic germane to a declared disaster, so long as the Governor's action is consonant with the rest of the Disaster Act. As additional support for this view, the State points to section 418.011, which charges the Governor with "meeting . . . the dangers to the state and people presented by disasters." *Id.* § 418.011(1). The State essentially contends that these Disaster Act provisions authorize any executive order thought by the Governor to be advisable in response to a disaster.

A more limited view of the Governor's authority would be that his Disaster Act orders only have "the force and effect of law" if they are grounded in a specific grant of authority that exists apart from his general power to issue executive orders. The State advances a theory of the Governor's authority under this more limited view of his executive-order power, as well. It invokes the Governor's power to "control ingress and egress to and from a disaster area and the movement of persons and the occupancy of premises in the area" as specific authority for executive orders prohibiting local mask mandates. *Id.* § 418.018(c).

As we interpret the Disaster Act, we are mindful of the constitutional concerns raised by Harris County and the other parties in

the pending cases. If we were to adopt a broad reading of the Governor's executive-order authority, we would have to answer whether that reading can be squared with the separation of powers required by the Constitution. This is yet another serious question of constitutional law, which we should not resolve unless required to do so. *In re B.L.D.*, 113 S.W.3d at 349.

> According to the Constitution:
>
> The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: those which are Legislative to one, those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.

TEX. CONST. art. II, § 1. It is a "settled maxim of constitutional law" "that the power conferred upon the legislature to make the laws cannot be delegated by that department to any other body or authority." *Proctor v. Andrews*, 972 S.W.2d 729, 733 (Tex. 1998). Successful delegation challenges are few and far between, however. *See Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 467–68 (Tex. 1997) (collecting cases). The non-delegation doctrine has come to be understood not as a categorical prohibition on the Legislature granting authority to other branches of the government, but as a requirement that, in order to do so, the Legislature must provide standards that are "reasonably clear and hence acceptable as a standard of measurement." *Id.* at 467 (quoting *Jordan v. State Bd. of Ins.*, 334 S.W.2d 278, 280 (Tex. 1960)).

Even acknowledging the humility with which courts should approach the Constitution's prohibition on delegating legislative authority, we cannot lightly set aside the County's non-delegation arguments. The Disaster Act contains one set of rules that can be applied to a wide variety of divergent circumstances. The viability of constitutional concerns about the Act's apparently broad grants of authority may depend on the circumstances in which the authority is asserted. For instance, in the context of the discrete, regional, and transient threat posed by a natural disaster, there may be little question that the Disaster Act validly delegates broad emergency-response authority to the Governor. But in the context of the coronavirus pandemic, a broad reading of the Disaster Act gives rise to extensive gubernatorial law-making authority over nearly every aspect of economic and social life throughout the State—because nearly every aspect of daily life was thought to be germane to the disaster.[37] Under the Disaster Act's terms, this broad authority commences when the Governor decides it should and lasts until he decides it should end (or until the Legislature, which is usually not in session, says otherwise). TEX. GOV'T CODE § 418.014(c). Whether the Disaster Act's standards guiding the Governor's exercise of such vast discretion are "reasonably clear and hence acceptable as a standard of measurement," *Boll Weevil*, 952 S.W.2d at 467, is a serious question of constitutional law, which we

---

[37] *See Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (disagreeing with public-health agency's assertion of authority during the pandemic because "[i]t is hard to see what measures [the government's] interpretation would place outside the CDC's reach").

should not resolve unless required to do so, *In re B.L.D.*, 113 S.W.3d at 349.

We can avoid this constitutional question by employing, for purposes of deciding this case, a more limited view of the Governor's Disaster Act authority. Under that view, the Governor's authority to issue executive orders "[u]nder this chapter" is not an open-ended font of law-making authority but instead is a means of exercising the specific powers granted by the Disaster Act. One of those specific powers is the Governor's authority to "control ingress and egress to and from a disaster area and the movement of persons and the occupancy of premises in the area." TEX. GOV'T CODE § 418.018(c). We turn now to that provision.

**2.**

Relying on the Governor's authority to control "the movement of persons" and "the occupancy of premises" within a disaster area, the State argues that the Governor may determine whether mask-wearing will be a condition of movement or occupancy throughout the disaster area, which includes the entire state. The County responds that the Disaster Act says nothing about *conditions* on the movement of persons or the occupancy of premises. While section 418.018(c) may empower the Governor to direct evacuation routes or to declare certain affected areas off-limits, the County argues that it does not empower him to override conditions imposed by local officials on the movement of persons or the occupancy of premises—conditions such as mask requirements.

30

It may very well be, as a matter of statutory interpretation, that section 418.018(c) should not be read to give the Governor unfettered authority to impose conditions on the movement of persons or the occupancy of premises on a statewide scale for an open-ended duration. We need not decide that question. The question presented is not whether the Governor may impose conditions or restrictions of his choosing on people's movement or on their occupancy of premises. Instead, the question is whether the Governor may override the conditions or restrictions imposed by local officials. These are two discrete questions, and they are questions of much different magnitude.

First, consider the power to "control" the movement of persons and the occupancy of premises by restricting or conditioning movement or occupancy. Nearly all human activity involves "the movement of persons" or "the occupancy of premises." The power to "control" these things is potentially an enormously invasive power over the daily life of every Texan.[38]

---

[38] The enormity of the power at stake may have implications for how we would interpret the statute. "Extraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" *West Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2609 (2022) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)); *see also Nat'l Fed'n of Indep. Bus.*, 142 S. Ct. at 665 (quoting *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489) ("We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance."). Apart from statutory interpretation, other legal principles safeguarding the liberty of the People may impose constraints on the authority to restrict or condition movement and occupancy. We are not asked to decide, for instance, how the statutory authority to control the movement of persons and the occupancy of premises interacts with the constitutional right of citizens to "assemble together for their common good." TEX. CONST. art. I, § 27.

Next, consider the power to "control" movement and occupancy in another sense. Consider the power not to restrict people's movement and their occupancy of premises, but the power to control attempts by subordinate levels of government to restrict movement and occupancy in ways that conflict with a statewide approach to confronting a statewide disaster. This is the power to control the government, not the power to control the People. Only this power is at issue here. The question before us concerns the arrangement of the government's internal command structure during a disaster—not the scope of its external power over citizens.

The strong default rule with respect to people's decisions about what to wear on their faces is, of course, individual liberty. Restrictions on this liberty are rare and remarkable exceptions in our state's—or any state's—history. On the other hand, restrictions on the government's ability to interfere with individual liberty are common and unremarkable aspects of a legal order founded upon the "great and essential principles of liberty and free government." TEX. CONST. art. I. Giving a government official the power to restrain other government officials is far more commonplace and far less remarkable than giving a government official the power to restrain people's freedom to move about as they please and to wear what they like. This case involves the former power, not the latter.

We therefore need not determine the outer bounds of the Governor's authority to restrict liberty by imposing conditions on the movement of persons or the occupancy of premises. We need only observe that there is no sense in which he "controls" movement and

32

occupancy if local officials may impose movement and occupancy restrictions against his orders. Whatever external limitations may exist on the Governor's (or anyone's) authority to restrict movement and occupancy, the Governor has authority under section 418.018(c) sufficient to override local orders that purport to "control" these things in a way that conflicts with his assessment of the appropriate statewide disaster response.

Unlike the genuinely extraordinary power to control the daily activities of citizens, the power to control the decisions of subordinate levels of government is not extraordinary at all. The Governor is "the Chief Executive Officer of the State." TEX. CONST. art. IV, § 1. The Constitution obligates him to "cause the laws to be faithfully executed." *Id.* § 10. It should come as little surprise that the Legislature empowered the Governor to control the response of the executive branch of government—at all levels, state and local—to a pandemic that knows no local jurisdictional lines. The Disaster Act envisions a coherent statewide or regional governmental response to a disaster, which cannot be accomplished without clear lines of authority coordinating Texas's patchwork of overlapping local jurisdictions. We see nothing extraordinary—and certainly nothing constitutionally problematic— about the Legislature authorizing the Governor to control the executive branch of government. Section 418.018(c) authorizes him to do so with respect to "the movement of persons and the occupancy of premises" during a declared disaster. Issuing an executive order prohibiting local mask requirements is a valid exercise of that authority. Such an order

therefore has the "force and effect of law" sufficient to preempt contrary local orders. TEX. GOV'T CODE § 418.012.

**3.**

The County nevertheless suggests that we should doubt the Governor's assertion of authority to control the pandemic response of local governments because, in the County's view, the Governor is claiming sweeping power over local matters that Texas law normally commits to local control. The reality, however, is that local control is not the default rule in this area. Quite apart from the Disaster Act, local governments have little or no autonomy under Texas law to impose disease control measures without oversight and control by the state government.

Chapter 81 of the Health and Safety Code specifically governs the use by local governments of "communicable disease control measures." *See generally* TEX. HEALTH & SAFETY CODE §§ 81.081, *et seq.* Harris County relies extensively on the authority granted by Chapters 81 and 121 of the Health and Safety Code to its local health authority to impose such measures. The local health authority, however, is already subject to the state government's preemptive control, whether or not the Disaster Act is invoked. *Id.* §§ 81.081, .082(a), .082(b).[39]

---

[39] At oral argument, we asked the parties to provide supplemental briefing regarding Chapter 81's grant to state officials of preemptive authority over the use by local governments of "communicable disease control measures." TEX. HEALTH & SAFETY CODE § 81.082(b). The parties did so. Some of the post-submission briefing objected to the Court's consideration of Chapter 81, on which the State did not rely in its initial briefing. The local governments, however, have relied extensively on Chapters 81 and 121 as support for their local orders, which placed at issue the Health and Safety Code's allocation of authority between state and local government.

A county's local health authority is a physician appointed by the commissioners court "to administer state and local laws relating to public health within the appointing body's jurisdiction." *Id*. § 121.021. The Legislature has given local health authorities "supervisory authority and control over the administration of communicable disease control measures in the health authority's jurisdiction." *Id*. § 81.082(a). The health authority's local control over "communicable disease control measures" is sharply limited, however, by the preemptive power of state officials. The Department of State Health Services "is the preemptive authority for purposes of" Chapter 81. *Id*. § 81.081. Disease control measures implemented by local health authorities can be "specifically preempted" by the Department. *Id*. § 81.082(a). The Department's broad preemptive power over local health authorities includes the explicit power to "amend[], revise[], or revoke[]" any communicable disease control measures imposed by the local health authority. *Id*. § 81.082(b).

The Health and Safety Code thus establishes a clear hierarchy when it comes to communicable disease control measures. Any use of control measures by local officials is subject to the "supervisory authority and control" of the local health authority. *Id*. § 81.082(a). The local health authority, in turn, is a "state officer," *id*. § 121.024(a), whose powers are entirely subject to the control of the Department of State Health Services, *id*. § 81.081, which may "amend[], revise[], or revoke[]" any communicable disease control measure imposed by the health authority, *id*. § 81.082(b). In this way, the state government already has ultimate control—apart from the Disaster Act—over any use of

35

communicable disease control measures by local governments, including mask requirements.[40]

Under normal circumstances, the Department of State Health Services is not the Governor, nor is its statutory authority his statutory authority. The Disaster Act, however, empowers the Governor to act, during a declared disaster, as "the commander in chief of state agencies, boards, and commissions having emergency responsibilities." TEX. GOV'T CODE § 418.015(c). Among the state agencies wielding significant emergency responsibilities during a pandemic is the Department of State Health Services. The Governor is therefore the "commander in chief" of the Department with respect to its emergency responsibilities during a declared disaster.[41]

---

[40] Neither party argues that mask requirements are not "communicable disease control measures" subject to the strictures of Chapter 81. We assume they are.

[41] The County disputes the extent to which the Governor may truly "command" the Department of State Health Services—including the Department's preemptive power over local disease control measures—during a declared disaster. The phrase "commander in chief," however, has a well-known legal provenance, most notably in the United States Constitution, which uses it to describe the President's authority over the armed forces. U.S. CONST. art. II, § 2; *see also* TEX. CONST. art IV, § 7 ("[The Governor] shall be Commander-in-Chief of the military forces of the State . . . ."). Armed forces are well known for rigid, hierarchical command structures and clear lines of authority. We are hard pressed to imagine terminology that would more clearly convey the Legislature's desire to put the Governor in full command of state agencies having emergency responsibilities during a declared disaster. Nevertheless, we need not resolve all disagreement about the scope of the Disaster Act's commander-in-chief power in order to conclude that the Governor's assertion of statewide control over the use by local governments of communicable disease control measures does not divest local governments of any autonomy otherwise afforded them by Texas law.

As Chapter 81's regime governing communicable disease control measures demonstrates, local governments in Texas already lacked the unilateral authority to impose such measures before the Governor issued GA-38.[42] In the end, the only question is whether the Disaster Act empowers the Governor—who the Act makes the "commander in chief" of the Department of State Health Services—to do something that state law already empowered his appointees at the Department to do. As explained in part III.D.2, *supra*, we conclude that section 418.018(c) of the Disaster Act provides this discrete measure of authority. An executive order prohibiting local mask requirements is therefore a valid exercise of the Governor's authority under the Disaster Act.[43]

---

[42] The County asserts that its commissioners court can wield autonomous public-health power outside Chapter 81's requirements. It points to section 121.003(a) of the Health and Safety Code, which provides that "the governing body of a municipality or the commissioners court of a county may enforce any law that is reasonably necessary to protect the public health." Reliance on such general public-health statutes ignores the Health and Safety Code's clear allocation of power to the local health authority to exercise "supervisory authority and control over the administration of communicable disease control measures in the health authority's jurisdiction unless specifically preempted by the department." *Id*. § 81.082(a). This plainly stated authority is specifically tailored to "communicable disease control measures," which the County agrees includes mask mandates. The specific statutory scheme governing communicable disease control measures prevails over the County's general public-health powers. If it did not, then Chapter 81's grant of "supervisory authority and control" to local health authorities—and its concomitant grant of preemptive power to state officials—would be illusory because neither could truly control the (potentially conflicting) use by various local officials of communicable disease control measures.

[43] The State does not contend that the temporary injunction should be dissolved on the basis that the local officials altogether lack authority to mandate mask-wearing for either statutory or constitutional reasons. Of course, if local officials lack the authority that Harris County's suit seeks to

## IV.

For the foregoing reasons, Harris County lacks a probable right to relief on the merits of its claims. The temporary injunction was therefore improper. The judgment of the court of appeals is reversed, the temporary injunction is dissolved, and the case is remanded to the district court for further proceedings consistent with this opinion.

James D. Blacklock
Justice

**OPINION DELIVERED:** June 30, 2023

---

vindicate, the County would not be entitled to a temporary injunction because its local orders would be unenforceable for reasons apart from the Governor's contrary orders. We make no comment on the extent to which local governments have authority to require masks in the absence of a gubernatorial order to the contrary. Nor do we comment on the Governor's authority to require them.